WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Lynn Ann Heuton,

        Plaintiff,

v.

Carolyn W Colvin,

        Defendant.

No. CV-15-00192-TUC-EJM

**ORDER**

      Plaintiff Lynn Ann Heuton ("Heuton") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Heuton raises five issues on appeal: 1) whether the Administrative Law Judge ("ALJ") failed to properly consider evidence submitted post-hearing; 2) whether the ALJ gave improper weight to the treating physician's opinion; 3) whether the ALJ improperly rejected the vocational evaluation report; 4) whether the ALJ failed to consider how Plaintiff's impairments would affect her occupational base of unskilled, medium work; and 5) whether the ALJ improperly discounted Plaintiff's credibility.[1] (Doc. 14 at 12; Doc. 22 at 2).

      Before the Court are Heuton's Opening Brief, Defendant's Response, and

---

[1] In her opening brief, Plaintiff also presented a claim alleging that the ALJ erred in determining that Plaintiff's part-time work qualified as past relevant work ("PRW"). Defendant argued that there was no harmful error on this issue because the ALJ made an alternative finding at Step Five of the sequential analysis. Plaintiff then abandoned this claim in her reply brief. Accordingly, the Court does not address it here.

Heuton's Reply. (Docs. 14, 21, & 22). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court finds that the ALJ erred in weighing Dr. Gray's treating physician opinion and Mr. Shapiro's vocational evaluation opinion and in negatively assessing Heuton's credibility. These errors impacted the ALJ's RFC assessment and the hypotheticals posed to the VE. Consequently, these errors were not harmless because they ultimately impacted the Step Five nondisability finding, and the Court finds remand for further proceedings is appropriate.

## I.   Procedural History

Heuton filed an application for Disability Insurance Benefits ("DIB") on August 29, 2011. (Administrative Record ("AR") 160). Heuton alleged disability beginning May 14, 2011 (AR 160) based on back pain, headaches, anxiety, fatigue, depression, and GERD. (AR 64). Heuton's application was denied upon initial review (AR 75, 99) and on reconsideration (AR 94, 104). A hearing was held on August 26, 2013 (AR 27), after which ALJ Lauren R. Mathon found, at Step Four, that Heuton was not disabled because she was able to perform her PRW as a resident aide (AR 19). Because Heuton argued that this work did not meet the criteria for substantial gainful activity, the ALJ also made an alternative finding at Step Five that Heuton was not disabled because she could perform other jobs existing in significant numbers in the national economy. (AR 20). On March 6, 2015 the Appeals Council denied Heuton's request to review the ALJ's decision. (AR 1).

Heuton's date last insured ("DLI") for DIB purposes is March 31, 2015. (AR 11). Thus, in order to be eligible for benefits, Heuton must prove that she was disabled during the time period of her alleged onset date of May 14, 2011 and her DLI of March 31, 2015.

## II.   Factual History

Heuton was born on June 9, 1952, making her 58 at the alleged onset date of her disability. (AR 64). Heuton has a high school education. (AR 179). She has worked a

number of different jobs including phone enrollment for HMOs, magazine stocker, housekeeper, janitor, and resident aide. (AR 321).

A.      Treating Physicians

The medical records include a number of progress notes from Heuton's care at the Southern Arizona VA beginning in 2004. Pertinent notes regarding Heuton's mental health care at the VA include the following:

April 6, 2004: Heuton was seen for an intake appointment and reported she was having trouble with being in a funk, just eating and sleeping and feeling stuck, and had not changed clothes in 3 days. (AR 607). She reported no anxiety or agitation but that she was quite sad and lacked motivation to get involved in the community. Nurse practitioner Lorna Cook assessed depression and prescribed Zoloft and referred Heuton for counseling. (AR 608; 456–57 [counseling consult request]). Heuton's depression screening was positive. (AR 609).

May 25, 2004: Cook observed that Heuton was "tearful though she laughs and cusses about most things she says," and assessed depression and grief. (AR 605). Cook prescribed Lexapro and sleeping pills.

July 4, 2004: Heuton was referred for counseling with Wilma Johnson for depression, and stated she had no motivation or energy. (AR 603). Johnson assessed depressive disorder with prolonged bereavement. (AR 604).

August 6, 2004: Heuton stated she wanted to return to counseling with the social worker. (AR 600; 455 [counseling consult request]). She was observed to be alert and oriented, and her mood disorder was improving. (AR 600–01).

August 18, 2004: Cook noted Heuton had severe depression, was isolated, and did not pursue the widow's group. (AR 598). She assessed depression exacerbation and prescribed Sertraline "to help stimulate and reduce withdrawn state" and indicated she would set up fee-based counseling. (AR 599; 454 [counseling consult request]).

November 18, 2004: Heuton reported she was increasingly tearful as it got closer to the anniversary of her husband's death. (AR 596). She reported buying a new horse

and making friends at the corral and making plans with them, which Cook noted was "a significantly higher level of social involvement than in the past." *Id.* Cook also noted Heuton had not been able to start counseling because she was not eligible for fee-based services. *Id.*; *see also* AR 451 [consult request inquiring whether there was a counselling space available for Heuton]. Cook assessed depression and increased Sertraline. (AR 597).

March 16, 2005: Cook noted Sertraline was not helping Heuton's mood and that she was having a lot of trouble sleeping and lacked motivation. (AR 590). Cook observed Heuton to be tearful and articulate, and recommended Heuton see a counselor for her depression. (AR 591; 449 [counselor consult request]). Cook also prescribed an antidepressant and sleep medications. Heuton tested positive on a depression screening. (AR 592).

March 28, 2005: At an individual therapy appointment, Heuton reported to social worker George Lawson that she had been depressed since her husband died in 1999 but had no symptoms of depression prior to that, and had been in her house depressed for the past 3 weeks. (AR 589). Lawson observed Heuton to be tearful and assessed major depressive disorder, recurrent, and recommended her PCP consider an anti-depressant.

April 25, 2005: Heuton reported she was doing a little riding but was sad and isolated for the most part. (AR 587). Lawson noted her attitude and insight was slightly improved, and assessed sustained grief reaction. *Id.*

May 18, 2005: Lawson observed Heuton to be more positive and assessed major depressive disorder, partial remission. (AR 586).

June 16, 2005: Cook noted Heuton was "brighter than any previous visit," medication change helped with less weeping, and counseling was helpful. (AR 584). Cook observed Heuton to be laughing, direct, and hopeful, and assessed good control of her depression. (AR 585).

September 16, 2005: Cook observed that Heuton was calm and laughing and noted her depression was nicely controlled on medication and that she was using sleeping pills

twice per week. (AR 582).

December 16, 2005: Heuton reported her father died in September and she was coping well; resting adequately. (AR 578). Cook noted normal mood and affect. (AR 579).

August 28, 2006: Heuton reported being significantly more depressed since she was not sleeping well, and tried doubling her antidepressant without relief. (AR 574). Cook observed her to be talkative with a low pitched voice and tearful, and assessed "depression exacerbation with grief overlay and poor sleep." (AR 575). Cook recommended Heuton see a counselor and consider a support group because "isolation is real issue for her." *Id.*

October 4, 2006: Heuton reported sleeping better but still struggling with feeling of no motivation; overwhelming sadness. (AR 569). Cook observed her to be tearful and articulate, and assessed depression and prescribed Wellbutrin. (AR 570).

November 15, 2006: Heuton reported feeling much better after taking Wellbutrin for 1 month and was sleeping well with her sleeping pills. (AR 564). Cook indicated Heuton was not eligible for a counselor. Heuton was observed to be laughing, bright, and talkative, and Cook assessed depression "much improved" and "expect this improvement to be sustained." (AR 565).

February 28, 2007: Increased agitation and blowing up more often; stopped Wellbutrin and crying on the couch again. (AR 560). Cook noted Heuton was "talking fast and abruptly but no physical restlessness, still usual laughter about her situation." (AR 561). Wellbutrin and Citalopram prescribed for mood control.

March 28, 2007: Doing much better on Citalopram. (AR 558). Counselling offered but Heuton felt it was not necessary. (AR 559).

June 12, 2007: On depression screen, Heuton reported having little interest or pleasure in doing things more than half the days, and feeling down, depressed, or hopeless several days. (AR 556).

August 14, 2007: Negative for PTSD screening. (AR 550).

September 24, 2007: Mood control good. (AR 546).

March 5, 2008: Mood control holding on Citalopram and Trazodone for sleep. (AR 538).

July 22, 2008: Heuton called and requested letter documenting her PTSD, needed for a job. (AR 537).

September 16, 2008: Does not do well off medications, tearful and cannot get motivated. (AR 527). Positive depression screen. (AR 528, 531).

July 7, 2009: Major depressive disorder well controlled. (AR 495).

February 3, 2010: Major depressive disorder well controlled mood and sleep. (AR 489).

April 9, 2010: Heuton called and stated she needed a letter written stating that her horses are therapy for PTSD; requested medication change because antidepressant was making her sluggish and irritable. (AR 480).

July 27, 2010: Not managing depression well; had anger outburst and lost her job; has lost motivation. (AR 476). Cook noted Heuton was tearful and assessed depression exacerbation and prescribed a mood stabilizer. (AR 477).

September 1, 2010: Cook noted Heuton was not eligible for care from VA mental health department. (AR 474). Observed Heuton to be talkative with no tearfulness; assessed depression and noted Heuton had not tolerated Bupropion. (AR 475).

September 27, 2010: Heuton called and requested consult with psychiatrist due to depression. (AR 472).

October 23, 2010: Exacerbation of depression, more tearfulness and anger; did not improve with Bupropion and no significant impact with additional Lamotrigine; Trazodone beneficial for sleep. (AR 468).

Additional medical information:

A note from Concentra dated March 22, 2011 indicates that Heuton injured her back, neck, and shoulders at work on March 18, 2011. (AR 643). Findings on exam included: cervical spine reveals no swelling, deformity, abnormal curvature or other

abnormalities; normal cervical ROM; palpation of cervical spine positive for tenderness; positive straight leg test produces back pain; lumbar ROM decreased mildly with pain; palpation positive for pain at L3, L4, and L5. (AR 644). The examiner assessed lumbar strain and shoulder strain and recommended therapy. *Id.*

Heuton saw Dr. Gray on April 18, 2011 for a follow-up on her neck and low back pain. (AR 329). Dr. Gray noted she did not have pain at the appointment, but had intermittent low back pain at an 8/10. Findings on exam include neck supple, extremities unremarkable, positive straight leg raise on the right, right ankle jerk absent, pinprick diminished in both lower extremities, and equivocal soft/light touch test. (AR 330). Dr. Gray observed that Heuton could heel and toe walk without difficulty but "was positional at times with regard to pain and splinting." *Id.* He assessed low back pain and back strain and referred Heuton for x-rays and a MRI of the lumbar spine. *Id.* Dr. Gray also recommended that Heuton was to remain off work "as there is no light duty for her and her job definitely entails significant lifting of 40 or 50 pounds at a time." *Id.*

Heuton had a MRI of the lumbar spine on May 5, 2011. (AR 350). The conclusion was diffuse degenerative changes throughout the lumbar spine, including mild to moderate compression deformities at T11 and mild compression deformities at T10, T12, L1, and L2. There was also mild disc bulging at T11–T12, L1–L2, L2–L3, L3–L4, and L5–S1, and moderate bulging at L4–L5. There were mild hypertrophic degenerative facet joint changes at L3–L4, and moderate to marked changes at L4–L5 and L5–S1.

On May 12, 2011 Heuton had nerve testing which showed a normal EMG of the lower extremities and normal nerve conduction velocities of the bilateral lower extremities. (AR 347). The impression was no evidence of radiculopathy or neuropathy, and no electrodiagnostic abnormalities. *Id.*

Heuton saw Dr. Gray on May 27, 2011 and reported a headache at 8/10 related to pain in her neck. (AR 332). On exam, Dr. Gray noted she could heel and toe walk without difficulty and got on and off the table with some antalgia. *Id.* Dr. Gray noted that Heuton's "EMG and nerve conduction velocities were normal in the lower extremities

and the MRI revealed generalized degenerative changes with some bulging discs within the lumbar spine and compressive changes in the T11–T12 vertebra but there was no evidence of any herniation." (AR 333). Dr. Gray referred Heuton for physical therapy ("PT") for her low back strain and continuing pain. (AR 333, 657–58).

A letter from Dr. Gray to Health Direct Inc. dated May 27, 2011 states:

> There definitely was a causal relationship between the bending and lifting that [Heuton] did on the date in question and the injury that she sustained. Her low back pain is definitely related to her back injury and strain and there is no evidence of any new injury.
>
> My current treatment protocol and plan is to have her undergo physical therapy 3 days a week for the next 4 weeks . . . We will also provide her with pain meds.

(AR 647).

Heuton saw Cook on June 21, 2011 for a follow-up on mood disorder and back pain. (AR 462). Cook noted that Heuton had chronic depression and prolonged bereavement, and recently had 3 panic attacks. (AR 463). Heuton reported going on worker's compensation in March after injuring her neck and back and stated she started PT and her neck was better. *Id.* Cook assessed chronic depression, moderate response to medication, and noted counselling was not available to Heuton through the VA. (AR 464). She also assessed low back pain and recommended Heuton continue PT, and prescribed medications for panic attacks and muscle spasms.

Heuton saw Dr. Gray on July 18, 2011 and reported her back pain was significantly better but that she was concerned about neck pain and was also experiencing headaches. (AR 334). Dr. Gray noted she was under a lot of stress after being evacuated from her home due to a fire. *Id.* Dr. Gray stated that PT was exacerbating Heuton's neck pain and advised that she discontinue PT and "just let time, love, and tenderness help to get things back into shape." (AR 335).

A PT discharge summary dated July 22, 2011 indicates that Heuton was being discharged for administrative reasons and did not complete her therapy program. (AR 323). A handwritten note, presumably from Dr. Gray, indicates that he advised Heuton to

- 8 -

stop PT because she had increased neck pain. *Id.* The therapist noted that Heuton had sharp, dull, radiating back pain at a 5/10, and that her pain was made worse by bending, lifting, and sitting for more than 15 minutes. (AR 324). The therapist also noted that Heuton reported numbness and tingling in the right upper and lower extremity, that she takes 2–4 Vicodin daily for headaches and knee pain, and that she had limited trunk sidebending, pain with straight leg raise, and tender bilateral lumbar and thoracic paraspinals. *Id.*

Heuton saw Dr. Sullivan on August 17, 2011 and reported depressive symptoms including loss of motivation, difficulty sleeping, decreased memory and concentration, poor appetite, and dysphoria beginning in the late 1990s. (AR 731). She also reported panic attacks when stressed, treated with Paxil. Dr. Sullivan assessed major depressive affective disorder recurrent episode severe degree without psychotic behavior and a GAF score of 60. He prescribed Effexor and Seroquel and discontinued Sertraline.

Heuton saw Dr. Gray on August 29, 2011 and reported continuing significant low back pain and neck pain. (AR 337). Dr. Gray noted that her back pain was variable and tended to be a 7.5/10. *Id.* On exam, Dr. Gray noted that straight leg raises were positive to 40 degrees and talar subflexion was also positive, and that Heuton was angulating without evidence of antalgia. (AR 338). Dr. Gray stated that he was waiting on records so that he could continue Heuton's work capacity evaluation and that he might send her to PT for an objective assessment of her work capacity. *Id.*

Heuton saw Dr. Sullivan on September 5, 2011 and reported feeling worse and no energy, but sleeping well and no panic attacks. (AR 730).

Heuton saw Dr. Gray on September 16, 2011 with concerns about continuing neck pain, headaches, and low back pain. (AR 340). Dr. Gray noted that this was all related to her workplace injury and that Heuton was unable to tolerate PT because it aggravated her headaches when they were working with her neck. *Id.* On exam, Dr. Gray noted that straight leg raises were positive at 30 degrees bilaterally. (AR 341). Dr. Gray ordered complete x-rays of the c-spine. *Id.*

Heuton had x-rays of her cervical spine on September 19, 2011. The conclusion was: 1. C5–C6 moderate degenerative disc disease with left bony neuroforaminal narrowing; 2. mild degenerative disc disease C6–C7 with bilateral bony neuroforaminal narrowing; and 3. mild degenerative disc disease C6–C7 with bilateral bony neuroforaminal narrowing. (AR 348).

Heuton saw Dr. Gray on September 26, 2011 and reported continuing significant upper extremity paresthesias and pain, headaches, and low back pain. (AR 343). Dr. Gray noted that Heuton's x-rays showed degenerative changes from C4–C7 with neuroforaminal narrowing at C4–5 and C6–7, and opined that "[t]here is no question that the C-spine degenerative joint disease can be responsible for the symptoms she is having in her upper extremities." (AR 344). He ordered a MRI of the cervical spine "to determine the extent of the compression and narrowing of the neuroforamina." *Id.*

Dr. Sullivan saw Heuton on September 28, 2011 and noted she was confused about which medications to take, and gave her samples of Pristiq and Saphris. (AR 729).

Heuton saw Dr. Sullivan on October 12, 2011 and reported she was feeling a little better and crying less but had poor motivation. (AR 728). Dr. Sullivan recommended she continue Pristiq and add Abilify.

Heuton saw Dr. Sullivan on November 2, 2011 for a follow-up and reported that she was doing a lot better, had more energy, and was scheduled for surgery on her neck. (AR 727). Dr. Sullivan recommended she discontinue Seroquel and Effexor.

A letter from Dr. Sullivan dated November 2, 2011 states: "This is to confirm that your horses are therapeutic for your depression and I would certainly encourage you to continue your equestrian activities." (AR 849).

Heuton saw Dr. Sullivan on December 15, 2011 and reported she was doing much better, put up her Christmas tree for the second time in 8 years, was sleeping well, and was pleased with her progress. (AR 745).

Heuton saw Dr. Sullivan on March 13, 2012 and stated she could not get the Pristiq through the VA and it cost $100 for a 90 day supply. (AR 747; 770 [note from

Cook stating Pristiq not available through VA]). She reported going on a horseback ride and enjoying it. (AR 747). Dr. Sullivan prescribed Effexor and noted he would return Heuton to Pristiq if her mood dipped.

Heuton called the VA on March 20, 2012 and asked to see mental health provider for depression and anxiety around recent SS DIB denial. (AR 766–67).

Heuton called the VA on May 2, 2012 and requested a MRI for her neck and complained of tingling in her right arm and severe headaches. (AR 765–66).

Heuton saw Cook on May 22, 2012 and reported low back pain and increasing neck pain. (AR 760). Cook noted chronic, recurrent major depressive disorder and noted that Heuton continued to engage with her horses and socially isolate herself. On exam, Cook noted Heuton had usual attention and range of motion but was somewhat restless, and had normal mobility. (AR 761). Heuton was negative for a PTSD screening test. (AR 763).

Heuton had x-rays of her cervical spine on May 22, 2012. (AR 750). Degenerative findings included: vertebral body heights of C4 through C6 mildly reduced; some loss of normal cervical lordosis; slight grade 1 retrolisthesis at C4–C5 and C5–C6; disc space narrowing is severe at C4–C5 and moderate to severe at C5–C6 and C6–C7 with associated osteophyte formation; uncovertebral and facet hypertrophy are present bilaterally; neural foraminal narrowing on the left appears potentially severe at C5–C6 through C7–T1, and mild at C3–C4 and C4–C5; neural foraminal narrowing on the right appears potentially moderate at C3–C4, severe at C4–C5, and moderate at C5–C6 and C6–C7.

On September 7, 2012 Heuton called the VA and requested a MRI of her neck because her pain medication was not working. (AR 759).

Heuton called the VA on January 28, 2013 stating she still had a lot of pain in her neck and requested a MRI. (AR 828).

Heuton had a MRI of her cervical spine on February 5, 2013 and the conclusion was disk protrusions and narrowed nerve root canals at multiple levels. (AR 850).

Specific findings included: bony sclerosis present on both sides of the C4–5, C5–6, and C6–7 intervertebral discs; C3–C4: both C4 nerve root canals mildly narrowed; C4–C5: disc space mildly to moderately narrowed and mild diffuse protrusion of the posterior disk, right C5 nerve root canal is moderately severely narrowed; C5–C6: disc space mildly to moderately narrowed and mild diffuse protrusion of the posterior disk, both C6 nerve root canals are moderately to moderately severely narrowed; C6–C7: disc space mildly to moderately narrowed and mild diffuse protrusion of the posterior disk.

On February 6, 2013 Heuton saw Cook for a follow-up for neck pain and reported the right side was hurting all the time. (AR 821). Heuton stated she had pain regularly in her neck and all 5 fingers in her right hand were numb and she drops things. *Id.* On the pain screen, Heuton reported her pain was a 4 and located at the base of her skull, and that her shoulders were stiff but did not hurt. (AR 826). On the depression screen, Heuton reported she had little interest or pleasure in doing things nearly every day and felt down, depressed, or hopeless more than half the days. *Id.* Cook noted Heuton's mood was holding and she was not interested in tapering her medications. (AR 822). On exam, Cook observed Heuton's neck motion was intact and slightly tight at the upper third. She assessed neck pain, some spasm, and noted Heuton did not have much relief from Gabapentin and added Tizandine for musculoskeletal pain. (AR 823). Cook also referred Heuton for x-rays because of her hand tingling, and counseling for her mood.

Heuton had x-rays of her cervical spine flexion/extension on February 6, 2013. (AR 796). Findings included: mild anterolisthesis upon flexion at C2–3; slight anterolisthesis upon flexion and retrolisthesis in extension at C4–5; no significant change at C3–4 and C5–6; discogenic degenerative findings greatest at C4–5 through C6–7 are similar in appearance to 5/22/2012 study.

A letter from Cook to Heuton dated February 14, 2013 states that Heuton's MRI showed her spinal cord was normal but that there was evidence of arthritic sclerosis in the C4–7 area which appeared to be the source of her neck pain. (AR 851). The letter also states that Heuton would benefit from trigger point relief.

On February 15, 2013 the VA issued Heuton a blood pressure cuff, heating pad, and cervical pillow. (AR 810–11).

On March 12, 2013 Heuton was seen at the VA pain clinic for neck pain evaluation and injections. (AR 808). Heuton reported her pain was a 6–8/10 and described it as dull, aching, and continuous and associated with migraines. She had prompt pain relief from the injection. (AR 809). Heuton was seen again for an injection on June 4, 2013 and had prompt pain relief. (AR 863).

Heuton saw Dr. Gray on August 16, 2013 with a complaint of neck and back pain for 2–3 years. (AR 878). Dr. Gray noted that he last saw Heuton on September 26, 2011 and that she has continued to have C-spine and LS-spine related symptoms. On exam, Dr. Gray observed the following: definite loss of fine touch to pinprick on the right upper extremity; loss of awareness of fine touch in right lower extremity; right ankle jerk absent; heel walking much more painful than toe walking; positive straight leg raise on the right and positive toe dorsiflexion indicative of the presence of radiculopathy in the lower extremity; loss of sensation in upper and lower extremities consistent with degenerative changes in neck and lumbar spine; walks with antalgic gait and has difficulty getting on and off table; not comfortable sitting for prolonged periods of time. (AR 879). Dr. Gray assessed low back pain, back strain, neck pain, cervical degenerative disc disease, GERD, peptic ulcer disease, and bereavement. He noted that he reviewed 240 pages of records from the VA and found that Heuton "has had long term problems with depression, secondary to bereavement and panic disorder," as well as plantar fasciitis, GERD, and gastric ulcer disease. (AR 880).

Heuton saw Dr. Gray on August 23, 2013 and complained of continued pain in her back and neck, and headaches associated with neck pain. (AR 882). She also reported numbness and tingling in the right upper extremity. On exam, Dr. Gray observed that Heuton continued to show evidence of decreased sensation in the right upper and lower extremities, and had an absent right ankle jerk. (AR 883). He made the following RFC assessment: stand 2 hours or less, sit 15–30 minutes or less, walk less than 1 block, lift

and carry 10–20 pounds occasionally, reach occasionally, never feel, finger, or handle, frequently grasp, and needs to lie down during the day and nap at least once, and alternate sitting and standing during the day. (AR 885). Dr. Gray also opined that Heuton would have difficulty climbing stairs and cannot climb ladders, noting she recently fell climbing into the tub and had an 8 inch bruise on her leg. (AR 883). Dr. Gray stated Heuton would miss more than 5 days of work per month due to her conditions. (AR 885).

B.      State-Agency Consulting Physicians

Heuton saw Dr. Gwendolyn Johnson for a psychiatric CE on February 27, 2012. (AR 732). Heuton reported a history of depression and anxiety beginning in 1999 after the death of her husband, and stated she was seeking disability based on PTSD. Heuton stated she lived alone and is able to prepare meal, complete chores, care for her personal needs, and drive, and enjoys spending time with her dogs and horses. Heuton complained of chronic back, neck, and knee pain and headaches, and stated she has been receiving psychiatric care through the VA since 1999. (AR 733). She also reported decreased concentration, irritability, mood swings, and sleeping problems, and 1–2 panic attacks per month.

On examination, Dr. Johnson noted the following: general attitude was cooperative and friendly; eye contact direct and steady; good expressive and receptive language abilities; rate, amplitude, and flow of speech within normal limits; mood was euthymic and affect was full range and appropriate; form and content of thought processes unremarkable; fair abstracting ability and judgment; fair fund of knowledge and range of ideas; intact cognitively; average intellectual levels and attention good; immediate short-term memory and remote memory grossly intact; good performance on concentration testing. (AR 733–34). Dr. Johnson diagnosed major depressive disorder, moderate, recurrent, with a GAF score of 60. (AR 734). She opined that Heuton "suffer[s] from a depressive disorder that has likely developed as a result of psychosocial stressors" and that "[b]ased solely on her present levels of psychological and cognitive functioning, Ms. Heuton's prognosis for a successful return to the work force is estimated

as good."

Dr. Johnson also completed a MSS, indicating that Heuton's condition would impose limitations for 12 months. (AR 735). She stated that Heuton had no evidence of impairment in her understanding and memory, social interaction, or adaptation, but opined that "Heuton's ability to concentrate may be impaired by depression and chronic pain. She may be able to manage noncomplex, repetitive tasks on a sustained basis."

Heuton saw Dr. Jeri Hassman on March 8, 2012 for a physical medicine CE and complained of neck and low back pain. (AR 737). She also reported increased headaches since her injury, frequent depression and anxiety, and occasional tingling in the right upper extremity. (AR 738). Heuton stated she could not return to work because of the pain and noted that PT did not help. (AR 737). Dr. Hassman reviewed the cervical spine x-rays from September 19, 2011 and the lumbar spine MRI from May 5, 2011.

On examination, Dr. Hassman noted the following: neck supple and nontender; full ROM of cervical spine without pain and no evidence of muscle spasm; spine straight and nontender; mild tenderness over right sacroiliac joint area; full ROM of lumbar spine without pain; extremely flexible; excellent lumbar extension and excellent lateral bending without any pain or reflex muscle guarding or spasm; straight leg test negative bilaterally; normal ambulation; able to bend down and kneel without pain; independent in getting on and off exam table and in and out of chair; full range of motion of upper extremities and lower extremities without pain; normal finger coordination; and no swelling, warmth or tenderness of shoulders, elbows, wrists, fingers, knees, ankles, or hips. (AR 738–39). Dr. Hassman noted that Heuton admitted she did not have neck or low back pain with sitting, only with prolonged standing or walking. (AR 738).

Dr. Hassman noted that Heuton complained of neck and low back pain but that her physical exam was unremarkable except for mild to moderate tenderness over the right sacroiliac joint area. (AR 739). She completed a MSS and indicated that Heuton's conditions would not impose limitations for 12 months. (AR 740).

. . .

C.     Additional Medical Information

Heuton was seen by Dr. Marjorie Eskay-Auerbach for an independent medical examination on November 22, 2011 as part of her Workers' Compensation claim. (AR 150). Heuton complained of neck pain, headaches, and radiation of pain into her right arm, and stated that her symptoms had worsened since the date of injury. *Id.* She further reported that since the work injury, her back pain had improved, her neck pain had persisted, and her headaches worsened. (AR 151). Heuton also reported a history of depression, anxiety, and PTSD. (AR 152). Heuton stated that she took 4 to 6 tabs of Vicodin per day, which helped her neck pain but not her headaches. (AR 151). Prior to the injury, she took Vicodin once per week for headaches. *Id.* On average, her pain is an 8/10. (AR 153).  Heuton completed a Pain Disability Questionnaire and scored in the range of severe disability. *Id.*

On examination, Dr. Eskay-Auerbach noted the following pertinent findings: no acute distress; no evidence of thoracic or lumbar scoliosis; normal gait; able to stand and walk on toes and heels without difficulty; steady gait; no tenderness to palpation of the midline; no tenderness of paraspinous musculature; no palpable paraspinous muscle spasm; mild tenderness over the SI joint; no tenderness to palpation of sciatic notch or greater trochanter; seated straight leg raise negative for pain; normal range of motion of hips; normal sensation in lower extremities; no difficulty getting on or off exam table. (AR 153–55). Dr. Eskay-Auerbach diagnosed resolved lumbar strain/sprain and noted the onset of low back pain symptoms was related to the work injury. (AR 156). Dr. Eskay-Auerbach stated that "[a]s it relates to her low back condition, [Heuton] can return to work without restrictions," and opined that there was no permanent impairment associated with the industrial injury. *Id.*

Heuton was seen by Philip Shapiro on August 19, 2013 for a vocational evaluation. (AR 893). Heuton stated that she had pain in her back most of the time, 3/10 on a good day and 8/10 on a bad day, and that she had a bad day 4 times a week. (AR 894). Heuton reported that she could sit for 20 minutes at a time, stand for short periods

of time, walk 1 block before needing a break, and drive for 20 minutes before needing to move around or get out of the car. Heuton also stated that she had difficulty sleeping due to the pain in her neck and that she usually has a headache when she wakes up. (AR 894–95). She takes 6 Vicodin daily, 2 antidepressants, Trazadone for sleeping, a muscle relaxant, and gets injections in her neck every 3 months. (AR 895). Her doctor mentioned that she might need surgery in the future. Heuton reported that counselling and medication were helpful for her depression, but that the VA no longer pays for counselling and she cannot afford it on her own.

Shapiro administered a variety of tests and noted the following pertinent results: Heuton has functional use of reading and arithmetic skills for use in entry level to skilled occupations where math is not a primary requirement of the job; potential for occupations requiring abstract nonverbal problem solving skills; ability to follow verbal directions without difficulty; scored in the below average range for finger and hand dexterity indicating poor potential for jobs requiring rapid manipulation of small tools and objects; poor potential for jobs requiring visualization and rapid manipulation of objects; potential problems with recalling information in a work setting; no difficulties with memory; and Heuton was able to work in a sitting position for 30 minutes to 1 hour before beginning to shift around and needed to take breaks every hour due to back and neck pain. (AR 897–900). Shapiro noted Heuton took more breaks than would be considered normal for a work setting and that she had difficulty sitting for more than an hour at a time, and that sedentary work would require her to sit for more than 2 hours at a time without breaks. (AR 899–900). Heuton indicated that she forgot to bring her medication to the evaluation. (AR 899). Shapiro noted no significant problems related to depression and observed that Heuton could attend to the task at hand without being distracted. (AR 900).

Shapiro opined that Heuton's age could be considered an issue for finding employment, and that she would not be able to handle a job requiring computer skills. (AR 901–02). He stated that Heuton "would require an accommodating employer if she were to return to work in order to accommodate her physical limitations, to include extra

breaks, lifting limitations, etc.," and that she would not be able to return to any of her prior jobs due to her inability to sit, stand, and walk for long periods of time. (AR 903–04). Shapiro concluded that Heuton had the basic aptitudes and functional academic skills to find entry level to possibly semi-skilled to skilled employment, but that she would have difficulty being gainfully employed for any length of time due to her neck and back pains, inability to work for prolonged periods of time sitting or standing, and issues with depression. (AR 904).

D.    Plaintiff's Testimony

A Disability Report dated September 8, 2011 notes that Heuton's depression and anxiety were increasing and causing panic attacks, fatigue, lack of energy, and significant confusion. (AR 184). Heuton reported panic attacks several times a week and stated she was easily confused or disoriented, and sometimes could not remember directions to her house, appointment times, or specific dates. *Id.* Heuton also reported that she very rarely had the energy to do anything, including small things like washing her hair or making a sandwich, and was overly exhausted. *Id.* She also reported angry outbursts and severe pain in her neck and back and constant headaches. *Id.*

On an undated Function Report, Heuton stated that she had severe back pain and was very depressed and tended to self-isolate. (AR 195). She reported her memory was getting worse and that she had to write reminders to herself for medications and appointments. (AR 195, 197). She tries to wake up early enough to feed her horses, but on a bad day she has someone else feed them. (AR 196). Before her illness, she could ride her horses and spend more time with them. (AR 199). She spends most of her day playing computer games or watching TV, but on a bad day cannot get out of bed. (AR 196, 199). Heuton indicated no problems with her personal care, and she prepares her own food consisting of frozen or pre-cooked meals. (AR 197). She can do a load of laundry or wash a few dishes for a few minutes at a time, tries to go outside daily, and can drive and go out alone. (AR 198). Heuton reported no social activities and stated she tends to stay away from people and does not like spending time with anyone, and only

wants to see her horses. (AR 199–200). Heuton indicated her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, remember, and get along with others. (AR 200). She can walk for 5–10 minutes and then needs to rest for 30 minutes, and can pay attention for a little while and follow simple instructions. *Id.* She does not like authority figures and shuts down from stress. (AR 201).

On a Disability Report—Appeal dated March 26, 2012 Heuton reported that her GERD had caused ulcers and substantial weight loss, that her depression and anxiety were more severe, that she had been diagnosed with PTSD, and that she was exhausted all the time and lacked motivation to get up and go, "likely because I know it will result in high levels of pain and anxiety." (AR 206). Heuton also reported that as her pain, depression, and anxiety worsened, so did her ability to stay on task, concentrate, and remember, and that she needed help to do simple chores like mucking the stalls. *Id.* She tries to be with her horses daily because it "is the one thing that gets me out of bed each day." *Id.*

A Disability Report—Appeal dated March 7, 2013 indicates that Heuton's back pain was more severe and her concentration and memory were declining. (AR 216). She reported being unable to engage in even minimally prolonged physical activities and having a difficult time staying on task and comprehending longer TV shows and written materials. *Id.* Heuton stated that she could still take care of her personal needs, but slowly and for a few minutes at a time, and that she needed longer and more frequent rest periods. (AR 220).

Heuton testified at her hearing before the ALJ on August 26, 2013. She stated that she receives financial support from her pension and from a surviving spouse benefit from the VA. (AR 31).

Heuton stated that she receives all of her medical treatment at the VA, and that the VA sent her to Dr. Sullivan because her depression pills weren't working. (AR 37). She cannot afford to go to a regular doctor and the VA only sees her once a year. (AR 38). Dr. Gray knows her history of back and neck problems, and she went to Dr. Gray so he could

help with her DIB case. *Id.* Heuton saw Dr. Gray in 2011 and then she stopped seeing him for a long period of time because she could not afford it. (AR 45). She saw him again recently before the hearing. (AR 46).

Heuton had a workplace injury when she worked for Source Interlink and received Workers' Compensation benefits, but her benefits ended after she saw a specialist and the specialist said there was nothing wrong with her neck. (AR 33, 38–39).

Heuton owns two horses and last rode about a year prior to the hearing. (AR 40). When she rode, she lifted her saddle onto her horse, and the saddle weighs 23 pounds. *Id.* Heuton grooms her horses but her friend Bob feeds them and mucks the stalls. (AR 41). It takes her about 15–20 minutes to groom a horse and she can stand for 20 minutes. (AR 41–42). After she takes care of her horses, she goes home to lie down and read and takes Vicodin. (AR 47). She spends her time lying down reading and has no social life or money to do anything. *Id.* She has 2 dogs that she lets out but does not walk them. (AR 48). For grocery shopping, she goes to St. Joseph's once a month to get free food. *Id.*

Heuton stated that she takes Vicodin, up to 6 per day on a bad day, and also takes an antidepressant, a muscle relaxer, and an anxiety pill. (AR 42). She does not have any side effects from her medications. *Id.* She takes 2 Vicodin when she wakes up because her neck gives her a constant headache. (AR 47). Heuton reported she has gained about 40 pounds since her workplace injury, though her attorney pointed out that based on the record, she has gained about 20 pounds. (AR 43).

Heuton testified that she could not do her past work as a resident aide because she has anxiety and mental issues, and could not physically take down a client. (AR 46). Regarding her past work as a janitor, she would find it difficult to vacuum, mop, and lift the chairs. *Id.* For her magazine stocking job, she had to lift 50 pound bins. *Id.* For her cleaning job, she lifted up to 40 pounds and was on her feet for the entire 8 hour shift. (AR 48).

E.    Lay Testimony

A note from Robert Pinter dated August 8, 2013 states that "Lynn Heuton and I

have adjacent stalls for our horses . . . For approximately one year, Lynn has not been able to clean or ride her horse." (AR 224).

A letter from Karen Bailey dated August 15, 2013 states that she has known Heuton for several years and recently witnessed concerning and alarming behavior. (AR 225). Karen described an incident where Heuton arrived at Karen's home and was visibly upset about a disagreement with a friend: "she ranted and yelled, much of which made little sense and when I was finally able to intervene and ask her to calm down Lynn then informed me she had not taken her medication that morning and stormed off." *Id.* Karen stated that when she spoke to Heuton a few hours later, she was in a better state, and Karen assumed she had taken her medication. *Id.*

F.     Vocational Evidence

Vocational Expert ("VE") Jennifer Carril testified at the hearing before the ALJ. She described Heuton's past work as follows: stock clerk, heavy and semi-skilled, and performed at the medium to heavy level by Heuton; night cleaner, medium and unskilled; resident aide, medium and semi-skilled, and performed at the light to medium level by Heuton. (AR 49).

Based on the first hypothetical presented by the ALJ,[2] Carril testified that a person with those limitations could not perform the night cleaner job due to the frequent use of the arms above the shoulders, but that a person could perform the resident aide job. (AR 49–50). Based on the second hypothetical presented by the ALJ,[3] Carril testified that a person with those limitations could not do the job of a resident aide. (AR 51). Based on the third hypothetical presented by the ALJ,[4] Carril testified that such a person could do

---

[2] The first hypothetical included the following restrictions: lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 out of 8 hours; frequently climb ladders, ropes, scaffolds, balance, stoop, kneel, crouch, crawl, and reach overhead above shoulders; no limits on climbing ramps and stairs; avoid concentrated exposure to hazards. (AR 49).

[3] The ALJ added the following mental limitations to the first hypothetical: can manage non-complex repetitive tasks on a sustained basis but cannot manage complex tasks on a sustained basis. (AR 50).

[4] The ALJ added the following mental limitations to the first hypothetical: mild

the job of resident aide. (AR 52).

On questioning by Heuton's attorney, Carril testified that a limitation to avoid concentrated exposure to hazards would not preclude any of Heuton's past jobs. (AR 52).

G.    ALJ's Findings

The ALJ found that Heuton had the severe impairments of back and neck pain and depression, but that the medical evidence of record did not establish that Heuton's impairments met or medically equaled the criteria of any listing. (AR 13–14).

The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 CFR 404.1520a(d)(1) and 20 CFR 404, Subpart P, App. 1, § 12.00. The ALJ found Heuton had mild restrictions in activities of daily living, moderate difficulties in social functioning and concentration, persistence, or pace, and had no episodes of decompensation of an extended duration. (AR 15).

The ALJ found that Heuton's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible because of "large gaps of time between visits to the doctor," because Heuton "received only minimal, conservative treatment," because Heuton was unsuccessful in seeking Workers' Compensation benefits, and because the imaging and clinical findings were inconsistent with the high levels of pain described by Heuton. (AR 17).

The ALJ declined to give Dr. Gray's opinion controlling or significant weight because his findings were largely based on Heuton's self-reported symptoms and because he had not seen nor examined Heuton for two years when he issued his MSS. (AR 18). The ALJ also noted that the restrictions recommended by Dr. Gray were not supported by the VA treatment notes or by Dr. Hassman's CE findings. *Id.*

---

limitations in understanding and remembering simple instructions, carrying out simple instructions, and ability to make judgments on simple work related decisions; moderate limitations in ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work related decisions; no limits on ability to interact with the public, supervisors, or co-workers; mild limitation on ability to respond appropriately to usual work situations and to changes in a routine work setting. (AR 51–52).

The ALJ also declined to give controlling or significant weight to Mr. Shapiro's report because it was "not consistent with the treating records and the conservative care the claimant has received." *Id.* The ALJ also noted that Shapiro was hired by Heuton's attorney and was not an acceptable medical source, and that his report was heavily based on Heuton's subjective complaints. *Id.*

The ALJ gave significant weight to Dr. Johnson's opinion "as fairly addressing the claimant's symptoms and possible limitations." (AR at 19).

The ALJ gave limited weight to the lay witness statements because they did not provide persuasive evidence of Heuton's disabling functional limitations. *Id.*

The ALJ found that Heuton could perform her PRW as a resident aide both as actually and generally performed. (AR 19). However, because Heuton argued that this work did not qualify as substantial gainful activity, the ALJ also made an alternative finding at Step Five that Heuton could perform other work existing in the national economy. (AR 20). The ALJ therefore concluded Heuton was not disabled. (AR 21).

### III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's residual functional capacity ("RFC") precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Heuton was denied at Step Four of the evaluation process. Step Four

requires a determination of whether the claimant has sufficient RFC to perform past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. An RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The ALJ also made an alternative finding at Step Five of the evaluation process. Step Five requires the ALJ to consider whether, based on the claimant's RFC, the claimant can make an adjustment to a new kind of work. 20 C.F.R. § 416.920(a)(4)(v). If the ALJ determines the claimant can make an adjustment to other work, the disability claim is denied. *Id.* "While the claimant has the burden of proof at steps one through four, 'the burden of proof shifts to the [Commissioner]' at step five 'to show that the claimant can do other kinds of work.'" *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (quoting *Embrey v. Brown*, 849 F.2d 418, 422 (9th Cir. 1988)).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's

conclusion." *Aukland*, 257 F.3d at 1035 (internal quotation marks and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion. *Id.* (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV. Analysis

Heuton argues that the ALJ erred in weighing her treating physician's opinion and by improperly rejecting a vocational evaluation report prepared by a vocational expert hired by Plaintiff's attorney. (Docs. 14 & 22). Heuton also argues that the ALJ failed to properly consider additional evidence submitted post-hearing, that the ALJ failed to

consider how Heuton's impairments and limitations would affect her occupational base, and that the ALJ erred in negatively assessing Heuton's credibility. *Id.* Heuton contends that these errors constitute error as a matter of law or an abuse of discretion and requests that the Court remand this matter for further consideration of the record as a whole to reevaluate Plaintiff's credibility and RFC. (Doc. 22 at 12).

The Commissioner contends that the Court should affirm the ALJ's decision because "Plaintiff did not meet her burden to show error or resulting harm to a substantial right." (Doc. 21 at 13–14). Defendant further states that the Commissioner's "decision is supported by substantial evidence and free of legal error." *Id.* at 14.

The Court finds no error in the ALJ's failure to specifically discuss Heuton's Workers' Compensation records in her decision. However, the Court concludes that the ALJ erred in weighing the opinions of Dr. Gray and Mr. Shapiro, and in negatively assessing Heuton's credibility based on her alleged lack of treatment and "minimal, conservative" treatment. These errors impacted the ALJ's RFC assessment and the hypotheticals posed to the VE. Consequently, these errors were not harmless because they ultimately impacted the Step Five nondisability finding, and the Court finds remand is appropriate.

A.     Post-hearing Evidence

Heuton argues that the ALJ erred in failing to consider the post-hearing evidence that Heuton timely submitted. (Doc. 14 at 14). Heuton alleges that the ALJ's decision makes no reference to the post-hearing evidence and that the ALJ's decision is "in direct conflict with the facts the evidence established." *Id.* Heuton further claims that if the ALJ had properly considered the evidence, the ALJ would have likely issued a decision in Plaintiff's favor. The Commissioner argues that although the ALJ did not address the evidence, the ALJ committed no error because "the evidence submitted was neither significant nor probative" and the ALJ is not required to address non-probative evidence. (Doc. 21 at 3).

The evidence at issue consists of Heuton's Workers' Compensation records from

her 2011 workplace injury.[5] The Workers' Compensation records include a number of duplicate records and copies of some of Heuton's treatment records from Dr. Gray, as well as a number of documents irrelevant to the issues here. A claim summary report dated October 7, 2011 states that Heuton was diagnosed with lumbar sprain and was being treated by Dr. Gray and receiving PT, and that if she was not cleared for full duty at her next appointment, she would be referred for an IME. (AR 997–98). A letter from ExamWorks to Dr. Eskay-Auerbach dated November 18, 2011 states that Heuton is to be seen for an IME to address the low back only. (AR 972). The letter notes that Heuton reported some improvement in her back to Dr. Gray but began to complain about her neck, but that the adjuster had not accepted Heuton's neck problems as part of the Workers' Compensation claim. (AR 972–73). A notice of claim status dated December 12, 2011 states that Heuton's temporary compensation and active medical treatment were terminated on November 22, 2011 because Heuton was discharged, and that her injury resulted in no permanent disability. (AR 930). A notice of claim status dated August 3, 2012 indicates that Heuton's petition to reopen her claim for benefits was denied. (AR 914).

The Court finds no error in the ALJ's failure to specifically address the Workers' Compensation records in her decision. While the Commissioner is required to "make fairly detailed findings in support of administrative decisions to permit courts to review those decisions intelligently," the Commissioner is not required to "discuss *all* evidence." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (emphasis in original). "Rather, she must explain why 'significant probative evidence has been rejected.'" *Id.* (citation omitted). In addition, while the Commissioner is "required to evaluate all the evidence in the case record that may have a bearing on [the] determination or decision of disability, including decisions by other governmental and

---

[5] Additional post-hearing evidence concerned Plaintiff's part-time work as a resident aide. This evidence is not relevant to the Court's decision because Plaintiff abandoned her claim regarding the ALJ's determination that the resident aide work constituted PRW.

nongovernmental agencies," "a determination made by another agency . . . is not binding on [the Social Security Administration]." SSR 06-03P at *6. "However, the adjudicator should explain the consideration given to these decisions." *Id.* at *7.

Here, Heuton's arguments regarding the Workers' Compensation records are somewhat convoluted, but in any event, the Court finds that the records are neither significant nor probative on the ultimate issue of disability. Heuton first argues that the records show that she was awarded benefits based solely on injury to her back, and that the decision to terminate her benefits was based on the examiner's determination that Heuton's back injury was resolved, but that the examiner did not consider Heuton's neck, feet, arm, or cognitive impairments. (Doc. 14 at 14–15). Heuton further states that if the ALJ had understood that only Heuton's back injury was considered in the Workers' Compensation claim, and if the ALJ had considered this evidence in relation to the rest of the medical record, then the ALJ would have given greater weight to Heuton's credibility because the evidence would show that Heuton reported neck pain, headaches, and arm tingling and numbness to the Workers' Compensation examiner during the same timeframe that she reported these ailments to her treating physicians, and that she also consistently reported temporary improvement in her back pain. (Doc. 14 at 14–16; Doc. 22 at 3). As noted above, the adjuster only accepted Heuton's back injury for the Workers' Compensation claim, and her benefits were terminated when Dr. Eskay-Auerbach opined that Heuton had no permanent injury and could return to work without restrictions. (AR 156). While Heuton did report neck pain and headaches to Dr. Eskay-Auerbach, Heuton also complained of neck pain and headaches to her providers at the VA and Dr. Gray during the same time period, thus providing documentation of these conditions. The fact that Heuton also reported neck pain and headaches to Dr. Eskay-Auerbach is largely irrelevant where Dr. Eskay-Auerbach was only instructed to evaluate Heuton's lower back condition and made no findings regarding Heuton's other conditions.

Heuton also argues that the ALJ incorrectly stated that Heuton was not successful

in her Workers' Compensation claim, and that the ALJ used this alleged failure to justify her finding that Heuton's conditions were not severe. (Doc. 14 at 16). However, while Heuton did receive benefits for a period of time, her Workers' Compensation case was ultimately closed when it was determined that she could return to work without restriction and had no permanent injury, and her subsequent petition to reopen her claim was denied. Thus, the ALJ's statement that there was evidence that Heuton's claim had been denied was, in fact, accurate. Heuton did receive compensation for her workplace injury, but only until the adjuster determined that her injury had resolved and her benefits should cease. The Workers' Compensation decision is not binding on the ALJ, but it is something that the ALJ may properly consider in making her disability determination. Thus, the ALJ could properly consider the fact that Heuton's case was terminated when assessing Heuton's credibility and the severity of her low back condition.[6]

In sum, the Court finds that the ALJ committed no harmful error in failing to specifically address the Workers' Compensation records submitted post-hearing. The records do not offer significant or probative evidence regarding Heuton's alleged disability and simply reflect that Heuton had a workplace injury, was compensated for that injury, and her benefits were then terminated. If anything, the records tend to go against Heuton's claim for disability because they show that the adjuster only accepted Heuton's back injury as part of the claim and that her benefits were terminated when Dr. Eskay-Auerbach opined that Heuton had no permanent back injury and could return to work without restrictions.

B.    Treating Physician Testimony

Heuton alleges that the ALJ erred in improperly rejecting the opinion of Dr. Gray, Heuton's treating physician. Heuton contends that Dr. Gray's opinion "should bear great

---

[6] In addition, though of little import to the Court's decision here, Heuton's counsel also misrepresents the amount of benefits Heuton actually received. While Heuton's counsel claims that Heuton received "close to TWENTY THREE THOUSAND DOLLARS" in Workers' Compensation benefits (Doc. 14 at 16), the claim report indicates that the total amount of benefits paid as of October 7, 2011 was $8,352.81 (AR 998). The $23,113.38 includes both benefits paid to date and the outstanding reserve amount, but it is not the total amount of benefits paid to Heuton. (AR 998).

weight, if not controlling weight." (Doc. 14 at 17). Heuton notes that although there was a gap in treatment, Dr. Gray "treated Plaintiff for years prior to the ALJ's decision," and "he did not render his opinion without first examining the Claimant again, and reviewing the new radiological evidence." *Id.* at 18–19. Heuton further contends that Dr. Gray's findings are not inconsistent with her radiological exams, her own reports, or Shapiro's report, and that the medical evidence of record "was sufficient to trigger the ALJ's requirement to build the record further before rejecting Dr. Gray's opinion." *Id.* at 19.

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns." *Potter v. Colvin*, 2015 WL 1966715, at *13 (N.D. Cal. Apr. 29, 2015). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest

weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. However, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

In addition, if the ALJ does not give the treating physician's opinion controlling weight, then the ALJ must evaluate the opinion according to the requirements set out in 20 C.F.R. 404.1527(c). Thus, in determining what weight to afford Dr. Gray's opinion, the ALJ was required to consider (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of Dr. Gray's opinion; (3) the consistency of the opinion and the record as a whole; (4) whether Dr. Gray is a specialist, and; (5) other factors that would support or contradict Dr. Gray's opinion. *Id.*

Here, if the ALJ believed that Dr. Gray's opinion was contradicted by the examining and consulting physician opinions, then the ALJ was required to give specific and legitimate reasons supported by substantial evidence for rejecting Dr. Gray's opinion. The ALJ first stated that Dr. Gray's findings and MSS "appear to be based in large part

on the claimant's self-reported symptoms." (AR 18). "[I]f the ALJ determines that the subjective complaints of the claimant are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those complaints." *Buckner-Larkin v. Astrue*, 450 Fed.Appx. 626, 628 (9th Cir. 2011). However, as discussed further in Section E below, the Court finds that the ALJ erred in negatively assessing Heuton's credibility. Further, Dr. Gray's opinion was based not only on Heuton's self-reported symptoms, but also on his independent examination of Heuton and his review of Heuton's medical records, including records from the VA and radiological studies. Accordingly, this is not a specific and legitimate reason to discount Dr. Gray's opinion.

Second, the ALJ stated that "Dr. Gray had not seen nor examined the claimant for nearly two years when he reported these findings." (AR 18). While there was a gap in Heuton's treatment by Dr. Gray, Dr. Gray's notes clearly indicate that he examined Heuton on two separate occasions in August 2013 prior to making his RFC assessment, and he also reviewed 240 pages of records from the VA, which included Heuton's most recent radiological studies, before issuing his opinion. (AR 878, 880, 882). Thus, the Court finds that the ALJ's rejection of Dr. Gray's opinion based on the gap in treatment is not a specific and legitimate reason to reject the opinion where Dr. Gray has a long-term history as Heuton's treating physician and where he both examined Heuton and reviewed her recent medical records before issuing his RFC opinion.

Third, the ALJ rejected Dr. Gray's opinion because the restrictions Dr. Gray assessed were "not supported [by] the VA treatment notes or the consultative examination results reported by Dr. Jeri Hassman." (AR 18). The ALJ's general citation to hundreds of pages of VA treatment notes is not a specific and legitimate reason to reject Dr. Gray's opinion. Further, the VA treatment notes do not contradict Dr. Gray's opinion, but rather document that Heuton consistently reported neck (AR 759, 760, 808, 821, 828) and back pain (AR 462, 760), headaches (AR 765–66, 808), and tingling in her right arm and fingers (AR 765–66, 821; *see also* AR 324 [reporting numbness and tingling in right upper and lower extremity to PT]). The imaging studies from the VA

also document Heuton's degenerative disc disease in her neck and back. (AR 348, 350, 750, 796, 850). In addition, Dr. Gray's opinion as Heuton's treating physician is entitled to more weight than Dr. Hassman's opinion, especially considering that Dr. Hassman only examined Heuton on one occasion on March 8, 2012 (AR 737), and did not have the benefit of reviewing Heuton's most recent radiological studies, including the MRI from February 5, 2013 (AR 850) and the x-rays from May 22, 2012 (AR 750) and February 6, 2013 (AR 796).

Fourth, the ALJ summarily concluded that Dr. Gray's opinion was "overly restrictive based on the objective evidence." (AR 18). Without specifically referencing what evidence in the record indicates Dr. Gray's opinion is "overly restrictive," this cannot serve as a specific and legitimate reason for rejecting Dr. Gray's opinion as Heuton's treating physician.

In sum, the Court finds that the ALJ failed to provide specific and legitimate reasons for discounting Dr. Gray's opinion and according it neither controlling weight nor significant weight. Further, the ALJ failed to address the factors set out in 20 C.F.R. 404.1527(c), particularly the frequency of examination and the length, nature, and extent of the treatment relationship, and the evidence in support of Dr. Gray's opinion, such as the most recent radiological studies showing a worsening of Heuton's condition. This error is not harmless, and the Court finds that remand for further consideration of Dr. Gray's opinion is appropriate.

C.    Vocational Evidence

Heuton alleges that the ALJ improperly rejected "Mr. Shapiro's report because he is not an acceptable medical source, failing to consider he is a Vocational Expert oft called upon by the State of Arizona to assess a person's ability or aptitude to meet the basic requirements of work." (Doc. 14 at 20). Heuton acknowledges that Shapiro is not qualified to diagnose her medically determinable impairments, but contends that "he is certainly a well qualified and appropriate source for evaluating her residual abilities to meet work requirements." *Id.* Defendant contends that the ALJ was only required to

provide germane reasons for rejecting Shapiro's opinion, and alleges that the ALJ met this standard here. (Doc. 21 at 8–10).

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted) (emphasis omitted). Thus, "[i]f the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). Pursuant to the Social Security Rulings, while only acceptable medical sources are qualified to establish the existence of an impairment, evidence from other sources may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P at *2. When evaluating opinion evidence from non-medical sources who have seen the claimant in their professional capacity, the Commissioner should consider:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

*Id.* at *4–5. The regulations further note that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the [] decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at 6.

Here, the ALJ declined to give controlling or significant weight to Shapiro's opinion because it was "not consistent with the treating records and the conservative care the claimant has received since the alleged onset of disability." (AR 18). However, the

ALJ fails to identify which treating records specifically contrast Shapiro's opinion. While the state-agency physicians did not assess the same limitations as Shapiro, Shapiro's opinion is largely consistent with Dr. Gray's opinion. For example, Dr. Gray opined that Heuton could stand for 2 hours or less, sit for 15–30 minutes, carry 10–20 pounds occasionally, and would need to alternate sitting and standing. (AR 885). Shapiro opined that Heuton could sit for 30 minutes to 1 hour and needed to take breaks every hour, and that she would require an accommodating employer to include extra breaks and lifting limitations. (AR 903). Both Dr. Gray and Shapiro also noted similar findings in assessing limitations on Heuton's ability to finger and grasp. (AR 885, 897–98). In addition, despite the ALJ's characterization of Heuton's care as "conservative," the medical record reveals that Heuton has consistently sought treatment for her conditions, including prescription pain medications, injection therapy, and radiological exams.

The ALJ also stated that Shapiro's opinion appeared to be heavily based on Heuton's subjective complaints. However, as discussed in more detail in Section E below, the ALJ erred in negatively assessing Heuton's credibility. Further, Shapiro's opinion was based not only on Heuton's self-reported symptoms, but also on his review of Heuton's medical records and his own independent examination and extensive testing of Heuton.

Finally, the ALJ noted that Shapiro was hired by Heuton's attorney and that the sole purpose of the evaluation was to evaluate Heuton prior to the disability hearing. While the ALJ may properly consider these factors under SSR 06-03P, the fact that the vocational evaluation was conducted by an expert hired by the claimant does not automatically mean that Shapiro's opinion is entitled to no weight. Here, the ALJ does not specify what weight she did assign to Shapiro's opinion, only that she did not accord it significant or controlling weight. In light of the ALJ's duty to evaluate evidence from non-medical sources who have seen the claimant in their professional capacity, the Court finds that remand is appropriate so that the ALJ may give further consideration to Shapiro's opinion and specify the weight given to his opinion.

1          D.      Step Five Finding

2          Heuton contends that the ALJ failed to consider how Heuton's impairments would

3  affect her occupational base of unskilled, medium work at Step Five of the sequential

4  evaluation process. (Doc. 22 at 10). Heuton specifically argues that the ALJ erred in

5  posing hypotheticals to the VE that failed to consider all of the relevant evidence and all

6  of Heuton's symptoms and limitations. (Doc. 14 at 22). Heuton contends that if the ALJ

7  had properly included limitations in the hypothetical that "one could reasonably expect to

8  result from the cervical impairments and bilateral carpal tunnel[7] confirmed with

9  radiological and clinical exams," the VE would have opined that Heuton was capable of

10  less than medium work. (Doc. 22 at 11).

11          At "step five of the five-step sequential inquiry, the burden shifts to the

12  Commissioner to prove that, based on the claimant's residual functional capacity, age,

13  education, and past work experience, she can do other work." *Smolen v. Chater*, 80 F.3d

14  1273, 1291 (9th Cir. 1996). "If she can, she is not disabled; if she cannot, she is

15  disabled." *Id*. "The Commissioner may carry this burden by 'eliciting the testimony of a

16  vocational expert in response to a hypothetical that sets out all the limitations and

17  restrictions of the claimant.'" *Conlee*, 31 F. Supp. 3d at 1173 (quoting *Andrews v.

18  Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "The ALJ's depiction of the claimant's

19  disability must be accurate, detailed, and supported by the medical record." *Id*. (citing

20  *Gamer v. Secretary of Health and Human Servs*., 815 F.2d 1275, 1279 (9th Cir. 1987)

21  (hypothetical questions must "set out all of the claimant's impairments")). "'If the

22  assumptions in the hypothetical are not supported by the record, the opinion of the

23  vocational expert that claimant has a residual working capacity has no evidentiary

24  value.'" *Id*. (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). "The ALJ,

25  though, 'is free to accept or reject restrictions in a hypothetical question that are not

26  supported by substantial evidence.'" *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir.

27  _____

28          [7] The Court does not recall any evidence in the medical record stating that Heuton
was diagnosed with bilateral carpal tunnel syndrome.

2006) (quoting *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001)).

Here, the VE testified that, based on the first and third hypotheticals presented by the ALJ, Heuton could return to her past work as a resident aide. The first hypothetical included the following restrictions: lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 out of 8 hours; frequently climb ladders, ropes, scaffolds, balance, stoop, kneel, crouch, crawl, and reach overhead above shoulders; no limits on climbing ramps and stairs; avoid concentrated exposure to hazards. (AR 49).[8] This hypothetical did not incorporate any of the limitations assessed by Dr. Gray. As discussed above, the Court finds that the ALJ erred in assessing Dr. Gray's opinion and Shapiro's opinion, and, as discussed in Section E below, the ALJ also erred in assessing Heuton's credibility. Both of these findings impacted the ALJ's RFC determination, which in turn also impacted the ALJ's hypotheticals to the VE. While the ALJ was only required to include limitations in the hypothetical that the ALJ found to be credible and supported by substantial evidence in the record, in this case the ALJ's errors in assessing Heuton's credibility and Dr. Gray's and Shapiro's opinions casts doubt on the reliability of the VE's testimony. The Court further notes that the VE was never asked specifically whether Heuton could perform other work existing in the national economy (Step Five), but rather gave testimony at Step Four stating that Heuton could perform her PRW as a resident aide. Accordingly, the Court finds that remand is appropriate.

E.    Credibility Finding

The ALJ found that Heuton was not entirely credible because "although she testified to severe, unremitting pain, the record reflects that there are large gaps of time between visits to the doctor," because Heuton "received only minimal, conservative treatment," because Heuton was unsuccessful in seeking Workers' Compensation benefits, and because the imaging and clinical findings were inconsistent with the high levels of pain described by Heuton. (AR 17). Heuton argues that the ALJ failed to

_____

[8] The third hypothetical included the same physical restrictions as hypothetical #1 with additional mental limitations. Heuton does not specifically object to the mental limitations posed in the hypothetical and the Court does not address them here.

consider the evidence documenting her worsening pain following a temporary improvement in her symptoms, and failed to consider how Heuton's "limited income and copayment requirements impacted her ability to remain in continuous treatment (beyond pharmacological treatment)." (Doc. 14 at 25). Heuton also alleges that the ALJ failed to consider the post-hearing evidence showing that Heuton was awarded Workers' Compensation benefits,[9] and ignored evidence supporting Heuton's credibility such as "her near constant employment through out [sic] her adult life" and the lack of any "criminal misconduct, malingering, drug or alcohol abuse, or noncompliance." *Id.* at 23, 24.

"An ALJ's assessment of symptom severity and claimant credibility is entitled to great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015) (internal quotations and citations omitted). This is because "an ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v. Comm'r. Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014) (citation omitted). "If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal quotations and citation omitted).

While questions of credibility are functions solely for the ALJ, this Court "cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Comm'r Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test

_____

[9] This issue is discussed in Section A.

and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Further, "[t]he ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

While it is permissible for an ALJ to look to the objective medical evidence as one factor in determining credibility, the ALJ's adverse credibility finding must be supported by other permissible evidence in the record. *Bunnell*, 947 F.2d at 346–47 ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks and citations omitted).

Here, the ALJ did not make a finding that Heuton was malingering; therefore, to support her discounting of Heuton's assertions regarding the severity of her symptoms, the ALJ had to provide clear and convincing, specific reasons.

The ALJ noted that "[i]n terms of the claimant's alleged musculoskeletal complaints, although she testified to severe, unremitting pain, the record reflects that there are large gaps of time between visits to the doctor seeking relief from that pain." (AR 17). The ALJ also stated that Heuton "received only minimal, conservative treatment for the complaints, consisting primarily of pharmacological and palliative remedies." *Id.* "[I]f a claimant complains about disabling pain but fails to seek treatment . . . an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). However, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of

1   funds." *Id.* (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). The ALJ

2   "'must not draw any inferences about an individual's symptoms and their functional

3   effects from a failure to seek or pursue regular medical treatment without first

4   considering any explanations that the individual may provide, or other information in the

5   case record, that may explain infrequent or irregular medical visits or failure to seek

6   medical treatment' including inability to pay . . ." *Orn*, 495 F.3d at 638 (quoting SSR 96-

7   7p at 7–8).

8        Here, the record reveals that Heuton has consistently sought medical treatment for

9   her musculoskeletal complaints since her workplace injury in 2011. Heuton saw Dr. Gray

10  several times in 2011 and also had a MRI, nerve testing, x-rays, and PT during that time

11  period. In 2012, Heuton continued to see Cook at the VA for both her mental and

12  physical health concerns, and had additional x-rays of her cervical spine. In 2013, Heuton

13  had another MRI and additional x-rays, and saw both Cook and Dr. Gray several times.

14  Thus, in contrast to the ALJ's finding that there are "large gaps of time between visits to

15  the doctor," the record indicates that Heuton has consistently sought treatment for her

16  complaints over a period of several years. Further, while the ALJ characterizes Heuton's

17  treatment as "minimal" and "conservative," the record documents that Heuton called the

18  VA multiple times requesting x-rays and MRIs because her pain medications were not

19  working, and that Cook referred her to the VA pain clinic for trigger point injections. In

20  addition, the x-rays and MRIs revealed degenerative changes that continued to worsen

21  over time, which is consistent with Heuton's reports of continuing pain in her neck, back,

22  head, and arm.

23       Further, there is evidence that Heuton did not pursue additional medical treatment

24  due to her limited funds. Heuton testified that she began seeing Dr. Gray in 2011, but she

25  stopped seeing him for a long period of time because she could not afford it. (AR 45). A

26  brief submitted prior the hearing before the ALJ states that Heuton "is widowed and has

27  very limited income and medical benefits through her deceased spouse, with no coverage

28  for psychotherapy. . . . Claimant has been very limited in regards to what exams,

medications and other treatments she could afford." (AR 137). Similarly, Cook noted several times that Heuton was not eligible for counseling through the VA (AR 464, 474, 564, 596), and that the VA would not cover her prescription for the depression medication Pristiq (AR 770). Dr. Gray also noted that Heuton was prescribed Flector patches for pain but did not fill the prescription because it was too expensive. (AR 879).

In sum, the Court finds that Heuton did regularly pursue treatment and consistently reported pain in her neck, back, and head, and that she has explained her failure to pursue further treatment due to limited insurance coverage and lack of funds. Accordingly, the Court finds the ALJ erred by improperly assessing Heuton's medical records and by improperly relying on Heuton's alleged lack of medical treatment as a reason to discount her credibility. Further, this error was not harmless. Had the ALJ properly considered Heuton's limited insurance coverage and lack of funds as a reason for her "minimal, conservative" treatment, the ALJ could not have relied on this alleged lack of treatment to justify her adverse credibility finding, which in turn affected the ALJ's RFC assessment and the hypotheticals posed to the VE. Thus, this error was harmful because it affected the ultimate nondisability determination. *See Molina*, 674 F.3d at 1115.

**V.   Remedy**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690. "'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (quoting *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593

(9th Cir. 2004). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke*, 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings.... Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995).

Here, the Court finds that remand for further administrative proceedings is appropriate. This Court offers no opinion as to whether Heuton is disabled within the meaning of the Act. However, the ALJ is required to consider all of Heuton's alleged impairments, whether severe or not, in her assessment on remand, and "[t]he RFC assessment must be based on *all* the relevant evidence in the case record." SSR 96–8p, 1996 WL 374184, at *5 (emphasis in original) ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."); C.F.R. § 416.920(e) (ALJ must consider claimant's subjective experiences of pain).

**VI.    Conclusion**

In light of the foregoing, the Court **REVERSES** the ALJ's decision and the case is **REMANDED** for further proceedings consistent with this decision, including additional hearing testimony, if necessary.

Accordingly, **IT IS HEREBY ORDERED** that the Commissioner's decision is remanded back to an ALJ with instructions to issue a new decision regarding Heuton's eligibility for disability insurance benefits. The ALJ will: (1) reassess Heuton's

credibility; (2) give further consideration to all of the previously submitted medical records and lay testimony, (3) further develop the record to fully and fairly assess Heuton's conditions and limitations, as warranted, (4) further consider Heuton's residual functional capacity, citing specific evidence in support of the assessed limitations, and (5) continue the sequential evaluation process to assess whether in fact Heuton is disabled within the meaning of the SSA and whether she is able to perform any work existing in the national economy.

**IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment, and close its file on this matter.

Dated this 9th day of August, 2016.

Eric J. Markovich
United States Magistrate Judge